**Harry TRUDRUNG, Petitioner,**

v.

**Marion TRUDRUNG, Respondent.**

**No. 1:10CV73.**

United States District Court,
M.D. North Carolina.

Feb. 10, 2010.

Afi S. Johnson–Parris, Law Office of Afi Johnson–Parris, Greensboro, NC, for Petitioner.

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Petitioner Harry Trudrung initiated this action by filing an Expedited Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent ("Verified Petition") (Doc. 1), seeking return of his minor child, E.T., pursuant to The Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 U.N.T.S. 49 ("Convention"), and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* ("ICARA"). Petitioner is seeking the return of E.T. to Germany on the ground that his son was wrongfully retained in the United States in violation of Petitioner's custody rights.

## I. BACKGROUND

The court finds the following facts from the verified pleadings as well as the evidence presented at a hearing on the Verified Petition the court held on February 9, 2010:

Petitioner, a United States citizen, and Respondent, a citizen of Germany, were married on February 1, 1993, in Reinheim, Hessen, Germany. They are the natural parents of the minor child, E.T., who was born in Germany. E.T. is now fifteen and one-half years old.

Since their marriage, Petitioner and Respondent maintained a home in common until they separated in March 2009. E.T. lived with his family in Germany up to the age of five. The family then moved to Columbia, South Carolina, where Petitioner was stationed in the U.S. military at Fort Jackson. In 2004, the family, which also includes an older brother and older sister of E.T., returned to Germany in anticipation of Petitioner's deployment to Iraq. From January 2004 to the present, the parties, E.T., his brother and sister, have all lived in Germany. Petitioner has since retired from the military with an honorable discharge but continues to work for the military in Germany in a civilian capacity.

Following the separation, E.T., his sibling, and Respondent all lived with Respondent's parents in Germany. Petitioner did not live with the family but maintained visitation with E.T. for several hours approximately every other weekend.

On or about December 16, 2009, Respondent traveled to Greensboro, North Carolina, with E.T. for a two-week vacation. Rather than returning to Germany as planned, Respondent and E.T. remained in the United States and enrolled E.T. at Northwestern Guilford High School in early January 2010.

On January 27, 2010, Petitioner filed the Verified Petition, seeking return of E.T. to Germany. (Doc. 1.) The court issued an Order on February 2, 2010 (Doc. 2), setting a show cause hearing for February 5, 2010, at 2 p.m. and ordering the U.S. Marshal to serve Respondent with the Verified Petition and Order. Despite multiple attempts on the following days, the U.S. Marshal was unable to serve Respondent.

Late in the day on February 5, 2010, Petitioner filed Petitioner's *Ex Parte* Motion Under the Hague Convention for Entry of a TRO, Application for Warrant Seeking Physical Custody of Child, and Scheduling of an Expedited Hearing; and Federal Rule 65(b) Certificate of Counsel (Doc. 3), which has been verified by Petitioner (Doc. 4), (collectively "Verified Motion") contending: Respondent was avoiding being served with the court's February 2, 2010 Order; E.T., who had been enrolled in a high school in Greensboro, North Carolina, failed to report to school after the court entered its February 2, 2010 Order; and thus that Respondent may attempt to flee with or further conceal E.T.

On February 8, 2010, this court entered an Order granting Petitioner's Verified Motion pursuant to ICARA, which permits the court to take measures under federal or state law to prevent the child's further removal or concealment before the final disposition of the Verified Petition, including ordering that the child be removed from the person having physical control of the child if the applicable requirements of state law are satisfied. 42 U.S.C. § 11604. The court found that under North Carolina General Statute § 50A–311, a warrant was justified to take physical custody of E.T. and the travel documents belonging to him and Respondent, because evidence revealed that he was likely to be imminently removed from the state. A hearing was set for and held at 4:00 p.m. on February 8, 2010, at which Petitioner and Respondent appeared with counsel. E.T., who had been taken into custody by the U.S. Marshal, was present. After hearing from the parties, the court placed E.T. in the temporary custody of Petitioner pending the determination of the Verified Petition. Counsel for Respondent requested that the hearing on the Verified Petition be continued until the next day, and the court set the hearing for 2:00 p.m. on February 9, 2010.

On February 9, 2010, the court held a show cause hearing on the Verified Petition. During the hearing, the court conducted an *in camera* examination of E.T. based upon an agreement of the parties.[1]

The case is now ripe for decision.

## II. ANALYSIS

The Convention seeks to protect children from the harmful effects of international parental abduction by setting out procedures to ensure that wrongfully removed children are returned to the country of their "habitual residence." Hague Convention, pmbl., art. 1, 19 I.L.M. at 1501. "[T]he primary purpose of the Hague Convention is 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir.2001). Congress enacted ICARA to implement the Hague Convention in the United States. 42 U.S.C. § 11601(b)(1). As noted by Congress, the Convention and ICARA "empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); *see Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir.2007) (noting that "a determination on the merits of the parent's underlying custody claim" is "reserved for the courts of the country of habitual residence").

---

1. In addition to the judge and E.T, the court reporter, law clerks, and attorneys were present for the *in camera* examination conducted in chambers; the parties elected not to attend.

## A. Petitioner's Prima Facie Case

■ In order to secure the return of an abducted child, a petitioner must prove by a preponderance of the evidence that the child "has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1). To prove wrongful removal or retention, the petitioner must establish the petitioner's country of residence at the time of the removal; (2) the removal was in breach of the petitioner's custody rights; and (3) the petitioner had been exercising those rights at the time of removal. *Bader,* 484 F.3d at 668.

At the hearing on February 9, 2010, Respondent agreed that Petitioner had made out the *prima facie* case for return of the child, with the Respondent stipulating to those elements. The court finds that the stipulation is supported by the preponderance of the evidence. · First, E.T. has resided in Germany and was enrolled in school there for approximately the past five years, living in the home of his maternal grandparents. Second, E.T. was retained in the United States wrongfully insofar as he was due back in school in Germany in January 2010 and was retained in the U.S. in contravention of Petitioner's custody rights, which Respondent does not dispute Petitioner shares under German law as E.T.'s parent though currently separated. *See Bader v. Kramer,* 445 F.3d 346, 350–51 (4th Cir.2006) (noting that under German law parents have joint custody of a child absent a court order otherwise). Here, the parties represent there is no court order regarding custody of E.T. to date. Finally, after the parents' separation, Petitioner regularly visited with E.T. approximately every other weekend.

Having found Petitioner's *prima facie* case for return of the child satisfied, the court will now turn to any defenses presented by Respondent.

## B. Respondent's Defenses

■ Upon a showing of wrongful removal or retention, return of the child is required unless the Respondent establishes one of several affirmative defenses. *Miller,* 240 F.3d at 398. Two of the defenses must be supported by clear and convincing evidence: (1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms." *Id.* (internal quotations omitted). The other three defenses may be supported by a preponderance of the evidence: (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country; (2) that the petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal, *id.* at 399; and (3) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of his or her views. Hague Convention, art. 13.[2] These defenses, or exceptions, are to be narrowly construed so that their application does not undermine the purposes of the Convention. *Tsai–Yi Yang v. Fu–Chiang Tsui,* 499 F.3d 259, 270 (3d Cir.2007); *England v. England,* 234 F.3d 268, 272 (5th Cir.2000). Even if a respondent meets the burden of proving one of the defenses, the court retains the

---

**2.** There are five affirmative defenses, although some opinions discuss only four. *Compare Bader,* 484 F.3d at 668–69 (discussing four)

*and Miller,* 240 F.3d at 398 (discussing four) *with Cantor v. Cohen,* 442 F.3d 196, 204 n. 7 (4th Cir.2006) (acknowledging five).

discretion "to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child." *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir.2007); *see England*, 234 F.3d at 270–71.

Here, Respondent raised two defenses at the hearing on February 9, 2010:(1) E.T. would face a grave risk of harm or an intolerable situation upon return and (2) E.T. objects to being returned and is of sufficient age and maturity such that his opinion should be considered. Each is addressed in turn.

### 1. Grave Risk of Harm/Intolerable Situation

The court may decline to order the return of the child if clear and convincing evidence demonstrates that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13b; see 42 U.S.C. § 11603(e)(2)(a). "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir.2005).

Respondent argues that E.T. faces a grave risk of harm or an intolerable situation if returned to Germany because there would be uncertainty regarding the conditions he would face. Respondent further contends that Petitioner's alcohol consumption may pose a potential risk of harm or an intolerable situation. Petitioner argues that there is simply no clear and convincing evidence of any grave risk or intolerable situation.

■ During his *in camera* testimony, E.T. stated that Petitioner left his grandparents' house upon his parents' separation and that he did not know where his father went. Further, he said that his

father picked him up for visits so he did not know where he lived or his telephone number. Approximately one week into his December 2009 trip to the Greensboro area, E.T.'s brother, who remains in Germany, informed E.T. during an online computer communication that Petitioner was upset about E.T.'s presence in the United States and that Petitioner wanted to get E.T. suspended from school "and pretty much make my life terrible." E.T. believed that Petitioner was unaware that E.T. had travelled to the U.S.

Further, E.T. testified, before the separation Petitioner drank between four to six beers after work unless he had upcoming physical training. If Petitioner fell asleep with a beer in his hand and awoke to someone attempting to remove the beer, E.T. stated, Petitioner could become angry and yell. E.T., stated, however, that his father had never been violent toward him and he had no reason to think that he would. E.T. expressed some concern on occasion whether his father, before the separation, was in a condition to drive E.T. in the mornings. While unaware of his father's current drinking habits, E.T. stated that at some point his father indicated he would stop drinking but that he had on at least one occasion consumed an occasional beer at a German festival or similar event.

The court finds that Respondent has failed to establish clear and convincing evidence that E.T. will face a grave risk of physical or psychological harm or otherwise place him in an intolerable situation if he is returned to Germany. The risk of harm must be grave, which is "a great deal more than minimal." *McManus v. McManus*, 354 F.Supp.2d 62 (D.Mass. 2005) (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir.2000)). Further, "[n]ot any harm will do nor may the level of risk be low." *Id.* Here, E.T. stated that if he

was ordered to return to Germany he would most likely choose to live at his grandparents' residence as before, not with Petitioner. While the evidence of alcohol use is a concern and is not to be disregarded, the court finds no evidence that Petitioner struck E.T. (or anyone else for that matter) or that E.T. fears harm from Petitioner. Indeed, there is no evidence that Petitioner consumed any alcohol after the separation at any time he had E.T. in his actual custody. The evidence is that Respondent's other son, E.T.'s older brother by one year, lives in Germany with Respondent's parents, and there was no argument that he was in any risk of harm. Indeed, Petitioner conceded at the hearing that, if E.T. is returned to Germany, Petitioner had no objection to E.T.'s living with his grandparents. Finally, even if E.T. were to reside with Petitioner upon a return to Germany, Respondent has not presented clear and convincing evidence that Petitioner's current alcohol consumption would present a grave risk or intolerable situation for E.T.

### 2. Age & Maturity

This court "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. The respondent's burden is a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(b). This burden applies to both the child's maturity and the child's objection. *Hazbun Escaf v. Rodriquez,* 200 F.Supp.2d 603, 615 (E.D.Va.2002). "The discretionary aspect of this defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child." *Id.; see also* Pub. Notice 957, 51 Fed.Reg. 10,494, 10,-509 (1986) ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child."). The Convention does not set forth a particular age at which a child's opinion should be considered, so the court's inquiry is necessarily fact-based. *See de Silva,* 481 F.3d at 1287.

As a threshold matter, the court must first determine if E.T. has reached an age and degree of maturity such that it is appropriate to consider his opinions. Respondent argues that E.T., at fifteen and one-half years old, is nearly 16, the age at which the Convention would no longer apply to him. Further, Respondent argues that E.T. is a well-reasoned young man who is not acting rashly but is focused on his future. Petitioner challenges the maturity of E.T.'s decision because E.T.'s desire to remain in the United States did not materialize until one week into the two-week vacation and was based upon questionable information given to him by his brother.

■ The court finds that E.T. has attained an age and degree of maturity such that the court should consider his opinion. He presented himself as an intelligent, well-mannered fifteen and one-half year-old. The court also notes that he is approximately six months from the age determined by the Convention to no longer be subjected to it procedures. Moreover, the court finds that E.T. is at the appropriate grade level for his age and maintains suitable grades and scores on standardized tests; there is no evidence of any learning disability or issue. He was able to present himself calmly and with poise during the examination and responded to questions in a succinct manner.

During the *in camera* examination, E.T. stated that he and Respondent traveled to the United States for a two-week vacation with the intent to return to Germany.

Upon being informed by his brother via an online computer communication that his father was reportedly upset to learn that E.T. was in the United States and that his father threatened to seek E.T.'s suspension from school,[3] E.T. decided he would prefer to remain in the United States. E.T. made this decision, he said, approximately one week into the vacation (and therefore one week prior to the planned return). He did so by talking about his decision with his mother, grandparents, brother, and sister's boyfriend.

E.T. wishes to stay here, he said, because he likes the school structure better (noting that the Greensboro school starts later and is of shorter duration) and claims that he earns higher grades here than in his German school, which would help him in reaching his goal of being an officer in the U.S. military. While active in the Reserved Officers' Training Corps ("ROTC") in his German high school, E.T. acknowledged that the Greensboro school does not have an ROTC program but that he has contacted a guidance counselor about the possibility of participating in such a program at another area school. E.T. denied any influence by his mother in his decision and contends she is simply supporting his decision to remain in the United States.

Respondent argues therefore that E.T.'s desire to stay in the United States is based upon his educational and career opportunities. Respondent relies heavily upon the report of Professor Elisa Pérez–Vera ("Pérez–Vera Report"), who was the official Hague Convention reporter and whose "explanatory report is recognized ... as the official history and commentary on the Convention." *See* Pub. Notice 957, 51 Fed.Reg. at 10503. In discussion of the child objection defense, the Pérez–Vera Report states that "the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will." The Pérez–Vera report, *Actes et documents de la Quatorziéme session, 6 au 25 octobre 1980, Tome III, Enlévement d'enfants; available at* http://www.hcch.net/index. Respondent contends that the *status quo* is to allow E.T. to remain in her custody insofar as she has maintained actual custody since the separation.

Petitioner argues that E.T.'s decision was reactionary, based on faulty information from his brother, and reflects influence from Respondent, who came to the United States for the purpose of visiting her new boyfriend and at whose house E.T. and Respondent have been living. Petitioner also points to the nature of E.T.'s responses to the court's questions as demonstrating that they reflect some briefing on the legal tests applicable to his case (e.g., stating it would be in his "best interests" to stay, and acknowledging the Convention would not apply to him when he turned 16 years old) and are evidence of undue influence by Respondent.

During the *in camera* examination, E.T. indeed stated that it would be in his "best interest" to remain in the United States, phrasing associated with the "best interest of the child" analysis associated with the underlying child custody determination, and he stated his belief that he could return to the United States upon turning sixteen. These responses indicate that he

---

**3.** E.T.'s response contradicts Petitioner's account in the Verified Petition and Verified Motion, both of which were prepared before E.T. testified and which state that Petitioner was aware that Respondent brought E.T. to the United States on a purported two-week vacation. The Verified Motion further alleges that Petitioner had been assured that E.T. would return to Germany for the start of school on January 4, 2010. (Doc. 3 at 2.)

has been presented with some legal context for his custody situation. Respondent has maintained custody of E.T. since separating from Petitioner, yet this court ordered Petitioner to take his physical custody the day prior to the *in camera* examination (and subsequently to abstain from any alcohol use). While the source of any preparation cannot definitively be known, the court finds that E.T.'s decision was likely influenced at least in part by his custodial presence with his mother for the nearly one year period since the separation.

The court finds that E.T.'s decision reflects the product of limited analysis. For example, his primary reason for deciding to stay in the United States was his online computer communication with his brother, who reportedly stated that Petitioner, upon learning that E.T. was taken to the U.S., said he would seek to have E.T. suspended from his German school. This contradicts Petitioner's verified pleadings, which indicate that he knew and approved E.T.'s departure from Germany for the U.S.; it was the wrongful retention (that had not then occurred) to which Petitioner objected. Moreover, E.T. claims he gets better grades in his new school in Greensboro, yet the school days have been very limited in the roughly three to four week period E.T. was enrolled.[4] Further, E.T. cites his career opportunities in the U.S., yet he concedes that the school program offered toward that end in which he was engaged at his German school, ROTC, is not currently available at his new school in Greensboro. In the end, it appears that E.T.'s decision to remain here may be influenced in large measure by the fact that his mother, with whom he wishes to stay, is staying with a boyfriend in Greensboro. The court notes that a "best inter-

est of the child" analysis is forbidden under the Convention; the factors noted above are considered solely for the purpose of determining the mature child's objection. *McManus*, 354 F.Supp.2d at 72.

■ The court has taken E.T.'s wishes into account but concludes that his return to Germany is appropriate in this case. As noted above, the defenses to the Convention must be construed narrowly. As such, there is a "demonstrated disinclination" among courts to defer to a child's objection as a basis to deny a petition. *Friedrich v. Thompson*, No. 1:99CV00772, 1999 WL 33954819, at *6 (M.D.N.C. Nov. 26, 1999); *see Tsai–Yi Yang*, 499 F.3d at 278–79 (noting a "'court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying the repatriation decision and not part of some broader analysis,' such as whether the child would suffer a grave risk of harm if returned to his or her habitual residence"). Much like the case of *Tsai–Yi Yang*, the child here has indicated more of a preference to remain in the United States rather than an objection to being returned to Germany. During the *in camera* examination, E.T. testified several times that he would "prefer" to stay here but expressed no strong objection to returning to Germany. *Tsai–Yi Yang*, 499 F.3d at 279 (affirming grant of return where child had no particularized objections and the reasons supporting preference to stay were insufficient); *see Locicero v. Lurashi*, 321 F.Supp.2d 295, 298 (D.P.R.2004) (finding preference to remain, including good grades, insufficient to disregard the narrowness of the age and maturity exception). Further, Respondent's argument that allowing E.T. to remain in the U.S. would preserve the *status quo* ignores the thrust of the Convention,

---

4. In addition, the court notes that the public schools have had a number of cancelled school days during that time because of an unusually harsh winter.

which seeks to preserve the *status quo* of the "habitual residence" rather than to reward the wrongful retention. While appreciating E.T.'s desire to control the decision as to his future location, which remains somewhat in limbo as his parents are separated, the court does not find it appropriate to deny E.T.'s return to Germany where his minor brother lives when the defenses are to be construed narrowly so as not to defeat the aims of the Convention.

## III. CONCLUSION

For the reasons set forth above, the court finds that the return of E.T. to Germany for an adjudication of child custody is appropriate. It is therefore required by Article 12 of the Convention that E.T. be returned forthwith to the Federal Republic of Germany with his father, Harry Trudrung.

IT IS THEREFORE ORDERED that Petitioner Harry Trudrung's Expedited Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent ("Verified Petition") (Doc. 1) is GRANTED. The minor child, E.T., shall be returned forthwith to the Federal Republic of Germany in Petitioner's Harry Trudrung's custody. Should the parties agree that E.T.'s return forthwith occur under Respondent's custody, such arrangement will comply with this Order so long as the court is duly informed of such an agreement in writing signed by both parties before E.T.'s departure.

IT IS FURTHER ORDERED that all travel documents are to be returned to the parties and E.T. to permit compliance with his Order.

Petitioner's counsel has requested attorneys' fees and expenses incurred in connection with this matter. (Doc. 1.) THEREFORE, IT IS FURTHER OR-DERED that Petitioner is permitted fourteen days to file an application for attorneys' fees and expenses, and Respondent shall have fourteen days to respond.